# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA 3 PH 2: 03
### ORLANDO DIVISION

UNITED STATES OF AMERICA

       **Plaintiff,**

  **v.**

JAMES MOORE,
ERIC JOHNSON,

       **and**

HELEN JONES,

       **Defendants.**

**Case No. 6:17-cr-187-Orl-37TBS**
18 U.S.C. § 1349
18 U.S.C. § 1344

---

## SUPERSEDING INDICTMENT

The Grand Jury charges:

Background

At all times material to this indictment:

*Defendants*

1.    Defendant James Moore founded Instant Access Group in the United Kingdom in 2002 and was its chairman. He was a limited partner with conspirators, known to the grand jury, in Lake Austin Properties I, Ltd., in the Orlando, Florida area, through offshore companies that he owned or controlled.

2.    Defendant Eric Johnson was vice president and loan underwriter at BankFirst in Lake Mary, Florida. He managed at least one other employee at

BankFirst. He was the relationship manager for Lake Austin Properties I, Ltd. and acted as loan underwriter for Lake Austin Properties I, Ltd. construction loans.

3. Defendant Helen Jones served as vice president of sales at Maesbury Homes, Inc., and vice president of sales at Lake Austin Properties I, Ltd. As vice president of sales, her responsibilities specifically included communicating with property buyers in the United Kingdom, which entailed answering the buyers' questions and concerns.

*Entities*

4. Maesbury Homes, Inc. (Maesbury Homes) was a Florida corporation owned jointly by conspirators known to the grand jury. This was a commercial and residential real estate development company that operated in the Orlando, Florida area. It had bank accounts with Mercantile Bank in the Orlando area and those accounts were used to deposit more than $100 million of buyer down payments for Lake Austin Properties I, Ltd.

5. Lake Austin Properties I, Ltd. (Lake Austin) was a Florida limited partnership comprised of other entities owned and controlled by defendant James Moore and conspirators, known to the grand jury. Lake Austin was the borrower and developer of five resort communities on adjacent land identified as Palisades (Parcel A), Avalon Resort (Parcel B), Grande Palisades (Parcel C), Magnolia Woods (Parcel D), and Twin Lakes (Parcel E) in the Orlando area. These five parcels were jointly referred to as Lake Austin Resort.

2

6.     Grande Palisades was a multi-tower 890-unit condominium resort community. BankFirst originated a $228 million revolving condominium construction loan to Lake Austin/Grande Palisades in 2007 with a maximum funded amount not to exceed $140 million. Lake Austin/Grande Palisades was required to provide approximately $74 million in borrower equity as a condition of the loan. BankFirst participated this loan to approximately 68 financial institutions throughout the United States, which included Century Bank in Sarasota, Florida; Cortez Community Bank in Brooksville, Florida; Atlantic Coast Bank in Jacksonville, Florida; Pacific National Bank in Miami, Florida; and First National Bank & Trust Company, in Larned, Kansas. Buyer down payments for Grande Palisades units were deposited into the Maesbury Homes account at Mercantile Bank.

7.     H & O was a Florida LLC created by conspirators, known to the grand jury, to purportedly fund approximately $30 million in subordinated debt to Lake Austin that satisfied a shortfall in the required approximate $74 million in borrower equity for Grande Palisades.

8.     Instant Access Group was an unregistered name used to refer to a group of related companies that included Inside Track Seminars Ltd., Instant Access Properties Ltd., and Fuel Investments Holdings Ltd., which were all United Kingdom companies. Inside Track Seminars Ltd. offered real estate investment consulting and marketing seminars in Europe. Instant Access Properties Ltd. provided real estate consulting services and managed the real estate acquisition

3

process to final loan closing for its members or investors. Fuel Investments Holdings Ltd. provided the residential mortgages to the buyers working through Instant Access Properties Ltd.

9.    Beginning in approximately October 2003, defendant James Moore created or caused to be created Leadenhall Group Limited in the British Virgin Islands as an international agent or marketer to United Kingdom persons to purchase real estate abroad. Leadenhall Group Limited was operated through a consulting firm in Switzerland. Defendant James Moore and another conspirator, known to the grand jury, controlled or were beneficiaries of Leadenhall Group Limited through their involvement with trusts or foundations established in Panama and Isle of Man. Commissions were paid by foreign developers like one of the conspirators, known to the grand jury, to Leadenhall Group Limited, with some funds then flowing to Instant Access Group.

10.    In approximately June 2004, defendant James Moore created or caused to be created Darrencrest Corporation in the British Virgin Islands to replace Leadenhall Group Limited. Defendant James Moore and a conspirator known to the grand jury, controlled or were beneficiaries of Darrencrest through their involvement with trusts or foundations established in Panama and Isle of Man.

11.    Beginning in 2004, Instant Access Properties solicited condominium purchasers for Lake Austin. In return for each unit sold and the buyer's 25% non-refundable down payment, Lake Austin paid Darrencrest a 10% commission of the

4

condominium's purchase price. The commission payments to Darrencrest were deposited into an account in Geneva, Switzerland.

12. The condominium down payments ranged from approximately $50,000 - $130,000, for approximately 1,687 investors from the United Kingdom with more than $150 million deposited into the Maesbury Homes account at Mercantile Bank. Approximately $58 million was then wire-transferred at the direction of conspirators known to the grand jury to the Darrencrest account in Switzerland as commission payments.

*Financial Institutions*

13. Marshall BankFirst Corporation was a financial services company headquartered in Minneapolis, Minnesota. It was a bank holding company that included BankFirst, Marshall Financial Group, LLC known as "The Marshall Group," and Marshall Bank.

14. BankFirst was a financial institution regulated by the Federal Reserve and the deposits of which were insured by the Federal Deposit Insurance Corporation (FDIC) and was headquartered in Sioux Falls, South Dakota. As part of Marshall BankFirst Corporation, it handled credit functions such as loan origination, loan servicing, loan administration, and risk management. On or about July 17, 2009, BankFirst failed as a financial institution and was placed into FDIC receivership.

5

15.     The Marshall Group was an unregulated financial entity that was headquartered in Minneapolis, Minnesota. As part of Marshall BankFirst Corporation, it provided loan participation and loan syndication opportunities to an extensive network of commercial banks and financial institutions throughout the United States.

16.     Marshall Bank was a financial institution regulated by the Office of the Comptroller of the Currency and the deposits of which were insured by the FDIC and was headquartered in Hallock, Minnesota. It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin/Grande Palisades. Marshall Bank participated approximately $1 million. On or about January 29, 2010, it failed as a financial institution and was acquired with government assistance by United Valley Bank.

17.     Century Bank, a Federal Savings Bank, was headquartered in Sarasota, Florida. It was a financial institution the deposits of which were insured by the FDIC. It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin/Grande Palisades. Century Bank participated approximately $5 million. On or about November 13, 2009, it failed as a financial institution and was acquired with government assistance by Iberiabank.

18. Cortez Community Bank in Brooksville, Florida, was a financial institution the deposits of which were insured by the FDIC. It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin/Grande Palisades. Cortez Community Bank participated approximately $2 million. On or about April 29, 2011, it failed as a financial institution and was acquired with government assistance by Florida Community Bank.

19. Atlantic Coast Bank with headquarters in Jacksonville, Florida, was a financial institution the deposits of which were insured by the FDIC. It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin/Grande Palisades. Atlantic Coast Bank participated approximately $5 million.

20. First National Bank & Trust Company in Larned, Kansas, was a financial institution the deposits of which were insured by the FDIC. It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin/Grande Palisades. First National Bank & Trust Company in Larned participated approximately $506,000. First National Bank & Trust Company of Larned became the Larned Branch of Farmers Bank & Trust in approximately September 2010.

21. Citrus Bank was a financial institution the deposits of which were insured by the FDIC. A conspirator, known to the grand jury, established accounts

7

at Citrus Bank in 2000 for Maesbury Homes. Citrus Bank changed its name to Mercantile Bank in 2002, and the conspirator known to the grand jury maintained the Maesbury Homes accounts with Mercantile Bank. Mercantile Bank was a financial institution the deposits of which were insured by the FDIC. Mercantile Bank was purchased by T.D. Bank in approximately September 2010.

22.    CNL Bank was a financial institution the deposits of which were insured by the FDIC. A conspirator, known to the grand jury, established an escrow account at CNL Bank by May 2006, for deposits paid by condominium purchasers. Approximately 10% of the condominium purchase price was deposited into the escrow account. These deposits into the CNL account were transferred from a Maesbury Homes Mercantile Bank account.

23.    Credit Agricole (Suisse) SA was a financial institution in Geneva, Switzerland. Darrencrest established accounts at Credit Agricole by January 2005. For each of the buyer down payments, approximately 10% of the condominium purchase price was transferred to these Darrencrest accounts from the Maesbury Homes Mercantile Bank account.

*Loan Participation*

24.    Participation loans were loans made by multiple lenders, such as Century Bank, a Federal Savings Bank, Cortez Community Bank, Atlantic Coast Bank, and First National Bank & Trust Company in Larned, to a single borrower, such as Lake Austin/Grande Palisades, through an originating financial institution,

such as BankFirst. The originating financial institution typically underwrote the loan, took responsibility for the loan servicing of the participation loan, organized and managed the participants with related loan draws, and directly dealt with the borrower. In exchange for originating and servicing the loan, the originating financial institution received fees from the participant institutions and the borrower.

25. When the Lake Austin loan for Parcel C/Grande Palisades closed in April 2007, BankFirst was paid approximately $4.5 million as an origination fee, and a commission of approximately $369,000 paid to defendant Eric Johnson.

*Subordinated Debt*

26. H & O, LLC purported to make an unsecured loan to Lake Austin in an amount around $30 million. The unsecured loan was classified as subordinated debt, meaning that, upon Lake Austin's default, secured lenders, such as the participant financial institutions, would be repaid before unsecured lenders, such as H & O, LLC.

Scheme to Defraud

27. Beginning on or about December 2, 2003, and continuing through in or about September 2011, the dates being approximate and inclusive, the defendants,

**JAMES MOORE,**
**ERIC JOHNSON,**
and
**HELEN JONES,**

9

and conspirators known to the grand jury, devised a scheme to defraud Century Bank, a Federal Savings Bank, Cortez Community Bank, and Atlantic Coast Bank each located within the Middle District of Florida, First National Bank & Trust Company in Larned, and other participant financial institutions; and to obtain money and property owned by and under the control of these financial institutions by means of materially false and fraudulent pretenses, representations, and promises.

Manner and Means

28.	It was part of the scheme to defraud that the down payments to purchase condominiums were not placed into a traditional escrow account, but rather the account of Maesbury Homes.

29.	It was further part of the scheme to defraud that commissions were paid from the down payments to Instant Access Properties/Darrencrest, despite the contracts or sales agreements prohibiting such commissions from the down payments.

30.	It was part of the scheme to defraud the participant financial institutions that the contracts with condominium unit purchasers at Lake Austin prohibited the payment of commissions from their down payments, yet such commissions were paid from the down payments.

31.	It was further part of the scheme to defraud the participant financial institutions that the commissions from the down payments were misrepresented as marketing expenses.

10

32.     It was further part of the scheme to defraud the participant financial institutions that the commissions were transferred from the Maesbury Homes account to the Darrencrest account in Switzerland.

33.     It was further part of the scheme to defraud the participant financial institutions that H & O, LLC purported to make an unsecured loan, classified as subordinated debt, to Lake Austin/Grande Palisades.

34.     It was further part of the scheme to defraud the participant financial institutions that H & O, LLC never had $30 million to lend to Lake Austin/Grande Palisades and the subordinated debt was concocted to satisfy the requisite approximate $74 million in borrower equity to successfully participate the loan.

35.     It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendant Johnson, knew the subordinated debt was false.

36.     It was further part of the scheme to defraud the participant financial institutions that Lake Austin/Grande Palisades submitted false financial statements for 2005 to obtain the loan.

37.     It was further part of the scheme to defraud the participant financial institutions that after the Grande Palisades loan had closed and funding commenced in approximately March 2008, BankFirst personnel failed to fully inform participant financial institutions about Lake Austin/Grande Palisades marketing expenses, the 2005 financial statements, and the subordinated debt.

## COUNT 1

38.     Paragraphs one through thirty-seven are incorporated as though fully set out herein.

39.     Beginning on or about December 2, 2003, and continuing through in or about September 2011, the dates being approximate and inclusive, in the Middle District of Florida and elsewhere, the defendants,

**JAMES MOORE,**
**ERIC JOHNSON,**
and
**HELEN JONES,**

knowingly conspired and agreed together, with each other, and with other persons both known and unknown to the grand jury, to defraud Century Bank, a Federal Savings Bank, Cortez Community Bank, and Atlantic Coast Bank each located within the Middle District of Florida, First National Bank & Trust Company in Larned, and other participant financial institutions; and to obtain money, funds, and property owned by and under the custody and control of these financial institutions, by means of materially false and fraudulent pretenses, representations, and promises in violation of Title 18, United States Code, Section 1344.

Overt Acts

40.     In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the defendants and conspirators, both indicted and

unindicted, committed overt acts in the Middle District of Florida and elsewhere, including the following:

a. Beginning in 2003, defendant James Moore recruited an individual to act as an agent of Leadenhall Group Limited to identify international properties or developers for marketing those properties or developments to Instant Access Properties members.

b. On or about December 2, 2003, a conspirator, known to the grand jury, communicated via email to defendant James Moore and the Leadenhall Group Limited agent that he was meeting with another conspirator, known to the grand jury, about the Lake Austin development.

c. In or about February 2004, a conspirator, known to the grand jury, and the Leadenhall Group Limited agent accompanied another conspirator, known to the grand jury, to meetings with BankFirst about obtaining development financing for Lake Austin.

d. On or about July 19, 2004, a conspirator, known to the grand jury, noted in Lake Austin's corporate minutes that it had been approached by a marketing firm with a proposal to market the condominiums for Lake Austin to individuals in the United Kingdom in exchange for approximately 50% of the limited partnership interests in Lake Austin.

e. On or about August 7, 2004, a conspirator, known to the grand jury, signed an Amended and Restated Partnership Agreement for Lake

13

Austin that transferred partial ownership to British Virgin Islands entities owned or controlled by defendant James Moore and another conspirator, known to the grand jury.

f.    On or about April 4, 2005, a conspirator, known to the grand jury, signed an Agency Agreement between Lake Austin and Darrencrest that required Lake Austin to pay Darrencrest a 10% commission for each purchaser of a unit. This conspirator, known to the grand jury, signed as President of Lake Austin.

g.    On or about May 17, 2005, a conspirator, known to the grand jury, wire-transferred approximately $4,557,185 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland. These funds were deposits from approximately 149 buyers of condominium units for sale by Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

h.    On or about July 12, 2005, a conspirator, known to the grand jury, wire-transferred approximately $138,980 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland. These funds were deposits from approximately six buyers of condominium units for sale by Lake Austin, and represented the 10%

14

commission required under the Agency Agreement between Lake Austin and Darrencrest.

i.      On or about July 22, 2005, a conspirator, known to the grand jury, wire-transferred approximately $2,910,280 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland. These funds were deposits from approximately 72 buyers of condominium units for sale by Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

j.      On or about September 5, 2005, a conspirator, known to the grand jury, signed an Agreement between Lake Austin, Instant Access Properties, and Darrencrest. This Agreement appointed Instant Access Properties as the agent of Lake Austin and Darrencrest to market the sale of condominium units at Lake Austin.

k.      On or about September 7, 2005, a conspirator, known to the grand jury, wire-transferred approximately $217,280 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland. These funds were deposits from approximately seven buyers of condominium units at Lake Austin Properties, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

l.      On or about November 21, 2005, a conspirator, known to the grand jury, wire-transferred approximately $4,916,580 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland. These funds were deposits from approximately 147 buyers of condominium units at Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

m.      On or about January 6, 2006, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $25,000 to start construction on the home of defendant Helen Jones in Kissimmee, Florida. These funds were deposits from buyers of condominium units at Lake Austin.

n.      By April 2006, defendant Eric Johnson directed another BankFirst employee to prepare the Confidential Information Memorandum for the loan to Lake Austin by Marshall BankFirst. The Confidential Information Memorandum was the materials provided by BankFirst to the network of participating financial institutions.

o.      On or about October 6, 2006, a BankFirst employee, known to the grand jury, altered a chart in the Confidential Information Memorandum to reflect Lake Austin's second source of funds was "subordinated debt" instead of "borrower cash equity." That BankFirst employee provided this

amended chart to defendant Eric Johnson via email for his presentation to the credit committee the following week.

       p.     On or about October 18, 2006, defendant Eric Johnson signed the Marshall/BankFirst Commitment Letter to Lake Austin as Senior Vice-President of BankFirst.

       q.     An exhibit to the Commitment Letter signed by defendant Eric Johnson identified approximately $28 million in "marketing expenses" budgeted under the "subordinated debt" category.

       r.     On or about December 15, 2006, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $296,645.51 payable to the title company for the home of defendant Helen Jones in Kissimmee, Florida. These funds were deposits from buyers of condominium units at Lake Austin.

       s.     On or about March 28, 2007, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $2,500,000 payable to two of the conspirators, known to the grand jury, as "dividends," which generated approximately $87,000 in interest to those two conspirators. These funds in the Maesbury Homes account were deposits from buyers of condominium units at Lake Austin.

t.      On or about April 3, 2007, a conspirator, known to the grand jury, communicated via email with a BankFirst employee, known to the grand jury, about the documentation supporting the approximate $28 million in "marketing expenses" paid to Darrencrest.

u.      On or about April 27, 2007, the loan between Lake Austin Properties and BankFirst closed.

v.      In or about December 2007, an accounting firm retained by Lake Austin withdrew its audit opinion for calendar year 2005 financial statements because the commission payments to Darrencrest were in violation of Florida statutes. In response to this withdrawal, a BankFirst employee directed a conspirator, known to the grand jury, to retain a different accountant.

w.      On or about April 18, 2008, a BankFirst employee specifically communicated to others within the institution that a conspirator, known to the grand jury, used deposits from condominium unit purchasers for improper purposes.

x.      On or about February 24, 2009, a conspirator, known to the grand jury, falsely stated in an email communication to a condominium unit purchaser that 10% of the unit's purchase price was being held in an escrow account. The conspirator also falsely stated in that email communication that the amounts of the deposit over 10% had been used in the construction of Lake Austin's infrastructure.

y.     On or about May 13, 2009, counsel for Lake Austin informed BankFirst personnel that a conspirator, known to the grand jury, may have paid sales commissions to Instant Access from deposits provided by condominium unit purchasers.

z.     On or about June 26, 2009, Instant Access Properties sent a video of defendant James Moore to condominium unit purchasers informing them that the Grande Palisades was a fantastic investment or opportunity that would be easy to re-sell and that certificates of occupancy had been issued for Phase I. Defendant James Moore utilized real estate professionals and British celebrities in the video in an effort to allay the concerns of condominium unit purchasers.

aa.     On or about November 12, 2009, Outsource Service Management filed for foreclosure against Lake Austin, yet defendants James Moore and Helen Jones failed to inform the condominium unit purchasers.

bb.     On or about May 25, 2010, defendant Helen Jones convinced a condominium unit purchaser to remain invested and not request refund of the escrow deposit because the purchaser's rental guarantee payment would cover the closing costs and the rental guarantee would be honored.

cc.     On or about February 22, 2011, defendant Helen Jones sought to convince condominium unit purchasers to contact Lake Austin and alter the

19

unit purchased to one of the units recently completed in the first tower of Parcel C.

dd.    On or about September 9, 2011, defendant Helen Jones communicated to condominium unit purchasers via email that Lake Austin would continue with their project despite some delays.

ee.    As additional overt acts, the Grand Jury incorporates by this reference the allegations set forth in Counts 2 through 25 of the Superseding Indictment as though fully set forth at this point.

41.    This was all in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-25

42.    The allegations of paragraphs one through forty-one are repeated and realleged in Counts 2 through 25, inclusive, of this Superseding Indictment, as though fully set forth herein.

43.    On or about the dates below, in the Middle District of Florida and elsewhere, the defendants,

**JAMES MOORE,**
**ERIC JOHNSON,**
and
**HELEN JONES,**

along with others known to the grand jury, for the purpose of executing the scheme described above to defraud the participant financial institutions, and to obtain money, funds, and property owned by and under the custody and control of those

financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, caused money, funds, and property to be wired, each instance constituting a separate count with funds wired to BankFirst in Sioux Falls, South Dakota, in the approximate amount listed below, and including the approximate amount from the identified financial institutions located in Kansas.

| Count | Date | Total Participant Draw Amount | Financial Institution | Participant Draw Amount |
|---|---|---|---|---|
| 2 | March 31, 2008 | $5,031,872.79 | First National Bank & Trust Company in Larned, Kansas | $21,565.17 |
| 3 | April 1, 2008 | | Atlantic Coast Bank | $179,709.75 |
| 4 | April 21, 2008 | $8,274,047.99 | First National Bank & Trust Company in Larned, Kansas | $35,460.21 |
| 5 | April 22, 2008 | $8,274,047.99 | Atlantic Coast Bank | $295,501.72 |
| 6 | May 27, 2008 | $18,324,445.81 | First National Bank & Trust Company in Larned, Kansas | $78,533.34 |
| 7 | May 27, 2008 | | Atlantic Coast Bank | $654,444.50 |
| 8 | July 3, 2008 | $7,819,647.15 | First National Bank & Trust Company in Larned, Kansas | $33,512.78 |
| 9 | July 3, 2008 | $7,819,647.15 | Atlantic Coast Bank | $279,273.12 |
| 10 | August 5, 2008 | $7,889,494.84 | First National Bank & Trust Company in Larned, Kansas | $33,812.13 |
| 11 | August 5, 2008 | $7,889,494.84 | Atlantic Coast Bank | $281,767.67 |
| 12 | September 12, 2008 | $10,139,971.94 | First National Bank & Trust Company in Larned, Kansas | $43,457.02 |
| 13 | September 12, 2008 | $10,139,971.94 | Atlantic Coast Bank | $362,141.86 |
| 14 | October 3, 2008 | $11,211,586.43 | First National Bank & Trust Company in Larned, Kansas | $48,049.66 |
| 15 | October 3, 2008 | $11,211,586.43 | Atlantic Coast Bank | $400,413.80 |
| 16 | November 4, 2008 | $10,929,979.95 | First National Bank & Trust Company in Larned, Kansas | $46,842.78 |

| 17 | November 4, 2008 | | Atlantic Coast Bank | $390,356.43 |
|---|---|---|---|---|
| 18 | December 3, 2008 | $9,364,674.84 | First National Bank & Trust Company in Larned, Kansas | $40,134.32 |
| 19 | December 3, 2008 | | Atlantic Coast Bank | $334,452.67 |
| 20 | December 30, 2008 | $8,208,513.62 | First National Bank & Trust Company in Larned, Kansas | $35,179.35 |
| 21 | February 5, 2009 | $4,687,214.87 | First National Bank & Trust Company in Larned, Kansas | $20,088.07 |
| 22 | February 5, 2009 | | Atlantic Coast Bank | $167,400.53 |
| 23 | March 2, 2009 | $6,474,148.56 | First National Bank & Trust Company in Larned, Kansas | $27,746.35 |
| 24 | March 2, 2009 | | Atlantic Coast Bank | $231,219.59 |
| 25 | April 7, 2009 | $7,508,702.34 | First National Bank & Trust Company in Larned, Kansas | $32,180.16 |

44.    Each was in violation of Title 18, United States Code, Sections 2 and 1344.

## FORFEITURE ALLEGATION

45.     The allegations contained in paragraphs one through forty-four of this Superseding Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2).

46.     Upon conviction of the offenses identified in Counts 1-25 of this Superseding Indictment, the defendants,

**JAMES MOORE,**
**ERIC JOHNSON,**
and
**HELEN JONES,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), all property, real and personal, constituting and derived from proceeds obtained directly and indirectly as a result of such violations including, but not limited to, a forfeiture money judgment in the approximate amount of $145,000,000, for which the defendants are jointly and severally liable.

47.     If any of the property described above, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

e.   has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to forfeit substitute property of the defendants.

48.   This was all pursuant to Title 18, United States Code, Section 982(a)(2).

A TRUE BILL,

_____
FOREPERSON

JEFF SESSIONS
United States Attorney General

THOMAS E. BEALL
United States Attorney
District of Kansas

By:   _____
Scott C. Rask
Special Attorney to the Attorney General
Assistant United States Attorney

No. _____

## UNITED STATES DISTRICT COURT
Middle District of Florida
Orlando Division

THE UNITED STATES OF AMERICA

vs.

JAMES MOORE
ERIC JOHNSON
HELEN JONES

### *SUPERSEDING INDICTMENT*

Violations:   18 U.S.C. § 1349
              18 U.S.C. § 1344

A true bill,

_____
Foreperson

Filed in open court this 13th day

of December, 2017.

_____
Clerk

Bail $_____