# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA, )
)
               Plaintiff, )
)
vs. )      CASE NO.:6:17-cr-187-Orl-37TBS
)
JAMES MOORE, )
)
             Defendant. )
_____ )

## SENTENCING MEMORANDUM
## OF DEFENDANT JAMES MOORE

      James Moore, by and through his attorney, respectfully submits his sentencing memorandum for this Honorable Court's consideration in determining the appropriate sentence for him in this case:

**A. Introduction:**

      Mr. Moore will appear before this Court for sentencing on April 16, 2018.  The Court has the authority and responsibility to determine the appropriate period of time Mr. Moore will be confined.  The undersigned respectfully suggests that the issue should be justice.  What did Mr. Moore actually do and what is just punishment?  Mr. Moore has already been incarcerated for approximately 60 days. In addition, he was on bond subject to a curfew for 10 months. He has not seen his country, where his children reside, for over

-1-

a year. This sentencing memorandum is written with the hope that it will be of some assistance to this Honorable Court in exercising its discretion with regard to a just sentence as to Mr. Moore.

**B. Superseding Information:**

Pursuant to a plea agreement with the United States, Mr. Moore was charged on February 2, 2018 by superseding information with one count of misprision of a felony in violation of 18 U.S.C. Section 4.  A copy of the Superseding Information is attached hereto as Exhibit "A".

This count arises from the fact that in the fall of 2009, Paul Oxley, a real estate developer, admitted to Mr. Moore that he had improperly paid real estate sales commissions with deposits of customers that should have been used for actual construction only.  Mr. Moore refused to assist Mr. Oxley in any way.  However, Mr. Moore did not report the crime to law enforcement until after his arrest in February, 2017, as more fully explained below.

**C. 18 U.S.C. Section 3553(a) - "*Booker*" factors:**

Title 18 U.S.C. Section 3553(a) provides the factors to be considered in imposing a sentence in a Federal criminal case. Section 3553(a) provides:

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider-

(1) the nature and circumstances of the history and characteristics of the offenses and the defendant;

-2-

(2) the need for the sentence imposed-

    (A)    to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational, vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) * * * the sentencing range established [by the guidelines]; * * *

(5) any pertinent policy statement - * * *;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense".

Each of the factors set forth in Section 3553(a) are discussed below.

**(1) The Nature and Circumstances of the:**

**(A) History and Characteristics of the Offense.**

In or about 2000, James Moore got the idea to start a seminar business that taught people in London, England how to invest in real estate.  The idea of purchasing real property not to live in, but to rent to third parties, was a relatively novel concept in England at that time.  Through hard work James Moore turned the fledgling seminar

company, called Inside Track Seminars, into a thriving business presenting seminars throughout England to over 100 people a week.

In or about 2001, James Moore realized that students at his seminars wished to purchase real property. Mr. Moore formed a second company called Instant Access Properties. The Instant Access Properties business model was to enter agreements to be the outside sales agent of various independent developers who were willing to offer homes, town homes, and/or condominiums for sale in their respective developments at discounted prices to Instant Access Properties student members. Instant Access Properties charged a membership fee to the students of Inside track Seminars that wanted to invest in real estate projects located in England.

By 2003, Inside Track Seminars and Instant Access Properties had grown to the point that the entities employed approximately 400 people. James Moore wanted to sell the business. To do so James Moore was told by several different sources that he needed to hire and implement a professional management team to operate the companies in the future without his input.

To address these concerns/recommendations, Mr. Moore hired Neil Storey, an English diplomat, to locate and interview developers in the United States, Spain, and other European countries. Mr. Moore hired Bradley Rosser to act as the consultant/CEO of the companies as a group. Mr. Rosser hired a well regarded tax accountant by the name of Phil Donnison to minimize income taxes earned in countries other than England. Mr. Rosser also hired attorney Jonathan Berman, Esq. from the renown English law firm,

Mishcon De Rea. This is the law firm that represented Princess Diana prior to her tragic death.

During this period of time, Neil Storey met Paul Oxley, a developer in Orlando, Florida. Paul Oxley and his partner Martyn Harrison owned Maesbury Homes.  Paul Oxley had successfully constructed several large residential projects located near Disney World. Maesbury Homes was in the process of selling the completed units.  An agreement was reached whereby Instant Access Properties agreed to be a sub-agent to assist in locating potential buyers for the existing Maesbury Homes' projects. For international tax reasons, Phil Donnison formed an entity called Leadenhall to be the sales agent of Maesbury Homes. Maesbury agreed to pay a 10% commission upon receipt of its form purchase/sale agreement signed by the individual buyer as well as the required deposit.  In most cases the deposit was 25% of the purchase price. Maesbury agreed to pay an additional 10% commission at the actual closing for each unit.

In or about 2003, James Moore and his wife Kim Moore had marital difficulties that resulted in their divorce. James began spending most of his time with his children in Spain. He permitted his management team to run the companies. During this period of time, Paul Oxley was moving forward with the construction of his largest construction project to date. The development was known as the Grand Palisades at Lake Austin. It consisted of 1,750 units with an average sales price of $350,000.  The total projected sales were in excess of $500 million.  Grand Palisades at Lake Austin was ideally located a short distance from Disney's Magic Kingdom in Disney World.

Paul Oxley was convinced that his construction skills were second to none. However, he wanted Instant Access Properties to handle all of the sales on a preconstruction basis. Paul Oxley was willing to pay a commission of 10% at the time the buyer signed a Paul Oxley approved purchase contract and paid over a deposit of at least 25% of the purchase price. However, Paul Oxley did not want to pay an additional 10% commission at closing.

Negotiations between Oxley and Mr. Moore's management team followed and the parties ultimately agreed that a new entity called Lake Austin Properties, Ltd. would be formed to own the Grand Palisades project. Paul Oxley would directly and/or indirectly own and control 49.5% as a limited partner. James Moore would directly and/or indirectly own and/or control 34% as a limited partner. Brad Rosser and others would directly and/or indirectly own or control 15.5% as a limited partner. Paul Oxley and Brad Rosser owned indirectly 1% as the general partners. Due primarily to the divorce of James Moore, at Rosser's request Phil Donnison formed a new entity called Darrencrest to replace Leadenhall as the sales agent to Lake Austin Properties, Ltd. Rosser's percentage of ownership increased from 20% of Leadenhall to 27% of Darrencrest. Instant Access Properties remained the sub-agent of Darrencrest and was responsible as a independent sales agent to refer potential buyers to Paul Oxley.

The Grand Palisades project went forward. Attached hereto as Exhibit "B" are photos of the Grand Palisades under construction and upon completion. Paul Oxley and Maesbury Homes handled all aspects of the construction. This included any construction financing. Paul Oxley was the sole signatory on the Lake Austin Properties, Ltd. bank

accounts.   Darrencrest as the sales agent was paid a 10% commission on all sales contracts signed with the payment of a 25% deposit.   Darrencrest paid Instant Access Properties as the sub-agent for all of its expenses associated with operating a 400 person sales company with an advertising budget in excess on a million dollars a month.

During 2005, 2006 and early 2007, Instant Access Properties referred individual customers who together executed agreements to purchase all 1750 units at the Grand Palisades at Lake Austin.   Paul Oxley dealt directly with each of the 1750 individual purchasers.   Paul Oxley sent the purchase contract by FedEx directly to the individual buyers. The buyers signed the agreement and returned it to Paul Oxley by FedEx. The agreements  represented that no part of the deposit would be spent on sales commissions or advertising. This statement was consistent with Florida law governing condominium sales.

No one at Instant Access Properties in England knew of the Florida Law and they were not aware of the statements contained in Paul Oxley's contract.  At that time, Instant Access Properties represented over 75 developers in England and Europe. The company generated the sales of 4,000 units annually. The annual sales of the Grand Palisades at Lake Austin represented approximately 10% of the annual sales of Instant Access Properties. Attached hereto as Exhibit "C" is a sample Inside Track Seminar schedule.

In or about June 2007, Paul Oxley obtained a construction loan of $140 million from Marshall Bank First.   Marshall Bank First underwrote the loan with 65 other participating banks.  To obtain draws on the loan, on or about September 30, 2007, Paul Oxley submitted a financial statement stating that Lake Austin Properties, Ltd. had assets

of approximately $220 million and liabilities of approximately $220 million.  The assets included $22.7 million of cash, $46.9 million of deposits in escrow, $57.4 million of deferred selling costs, and $56.6 million in capitalized development costs. The liabilities included customer deposits of $171.9 million and construction loans of $47.6 million.

At that time, the Grand Palisades at Lake Austin was under construction and had no closings. The sole source of its funds were the customer's deposits or construction loans.   The auditors for Lake Austin Properties determined that $57.4 million of the customer deposits had been used to pay the deferred selling costs, i.e. sales commissions. The auditors advised Paul Oxley that this was in violation of Florida law.  Paul Oxley kept the auditors' report confidential and fired the auditors. Mr. Moore was not notified of the auditor report or the issues contained therein.

During 2008, the real estate market throughout the United states and Europe crashed. Within months, values of condominiums fell 25% to 50%.  This resulted in banks refusing to close the individual transactions at the Grand Palisades at Lake Austin. This in turn resulted in  Lake Austin Properties, Ltd. being unable to make the payments on the construction loan Paul Oxley obtained to construct the project.

In the spring of 2009, Mr. Moore was asked to participate in a promotional video to encourage individual investors not to abandon their investments in the Grand Palisades but to weather the storm and go through with the purchase of their respective units. Mr. Moore believed that eventually the real estate market would recover and the individual buyers would ultimately get the benefit of their bargain if they held on.  The video was

made. However, the video promotion had no effect because the banks refused to finance the closing of any unit. There were no closings at the Grand Palisades during 2009.

In the fall of 2009, Mr. Moore visited Paul Oxley.  Mr. Moore tried to visit Paul Oxley at least once or twice a year to see if any progress had been made.  Paul Oxley approached Mr. Moore and told Mr. Moore that he had to sign a document for Mr. Oxley. The paper prepared by Mr. Oxley stated that upon demand Darrencrest was responsible to repay all of the commissions it had received from Lake Austin Properties, Ltd.  Mr. Moore was surprised and declined to sign the document.  Paul Oxley became aggressive and stated that if Mr. Moore did not sign the document he, Paul Oxley, would likely be going to jail.  Mr. Moore told Mr. Oxley that he had no idea what Mr. Oxley was talking about but, Mr. Moore would not help him cover up any wrong doing.  Mr. Oxley began shouting and told Mr. Moore that all of the sales commissions paid to Darrencrest and/or Instant Access Properties came from customer deposits.  Mr. Oxley then told Mr. Moore for the first time that this was in violation of Florida condominium law. Mr. Moore was shocked but refused to sign any paper for Mr. Oxley.  Mr. Oxley demanded Mr. Moore to vacate the Maesbury Homes offices. Mr. Moore was physically escorted to the door.

Mr. Moore did not report Mr. Oxley's crime to law enforcement. The FDIC commenced an investigation into Paul Oxley's application for the construction loan for the Grand Palisades at Lake Austin.  It was determined that the financial statements submitted by Paul Oxley to obtain the loan failed to disclose the contingent liability caused by Paul Oxley using a portion of customer deposits to pay sales commissions.  On or about February 15, 2017, Mr. Moore traveled to Florida to visit his new wife for

Valentine's Day.  Mr. Moore was arrested at the airport and presented with an indictment that charged him with bank fraud.

Mr. Moore waived his right to a lawyer and agreed to cooperate by giving a video interview to the special agents. During the 2 hour interview Mr. Moore answered all questions concerning Paul Oxley, Maesbury Homes, Lake Austin Properties, Instant Access Properties and Inside Track Seminars.  During this interview, the special agents learned that Mr. Moore did not apply for any bank loan. He did not provide information to Paul Oxley to apply for any bank loan. Mr. Moore did not meet with any of the bankers. He was not a signatory on any bank account. Mr. Moore was not involved with any of the deposits held in escrow and never met the escrow agent. Mr. Moore had never met the auditors of Maesbury Homes or Lake Austin Properties, Ltd. Mr. Moore visited Paul Oxley's office on average 1 or 2 times a year.

The United States produced the discovery which consisted of over 100,000 pages of documents.  There were virtually no communications between Mr. Moore and Paul Oxley in the discovery. There were virtually no communications between Mr. Moore and any of the bankers. There also were no communications between the auditors and Mr. Moore.  Despite these facts, Mr. Moore was incarcerated for approximately 60 days before he was released on bond with a ankle monitor requiring him to be home by the curfew set by probation.

Mr. Moore's bank fraud trial was scheduled to commence on February 5, 2018. Mr. Moore was told that the federal sentencing guidelines calculated by the government were "life".  Mr. Moore could not believe as a foreigner that there was a possibility that

he might get a life sentence for a crime he truly did not commit. The stress on Mr. Moore and his wife was enormous.   Finally, a few weeks before the trial was scheduled to commence the United States offered Mr. Moore an opportunity to resolve his legal issues arising from the Grand Palisades by entering a plea agreement.   Under the terms of the plea agreement, if Mr. Moore agreed to plea guilty to the crime of misprision of a felony, the United States would drop the bank fraud and conspiracy to commit bank fraud charges contained in the superseding indictment.   Prior to these proceedings, Mr. Moore did not know that misprision of a felony was a crime. The crime of misprision of a felony had been repealed in England in or about 1966.   Mr. Moore entered the plea agreement and formally entered his plea of guilty to the charge of misprision of a felony before the Court on February 5, 2018.

## (B) History and Characteristics of the Defendant:

The nature and circumstances of the history and characteristics of the defendant as required by Section 3553(a) are set forth below. James Moore is 57 years old. He is divorced from Kim Moore. They had three children. Despite a contentious divorce, all parties agree that Mr. Moore has always been an exceptional father.   He is remarried to Karina Moore. Mr. Moore has never been convicted of any crime. He has a reputation amongst the people who know him of being honest, hardworking, generous and compassionate. He greatly values his children and friends.

A large number of family and friends have written letters to this Honorable Court to provide the Court with an understanding of the individual who the Court will sentence. Each of these persons is aware of the charge to which Mr. Moore has pleaded guilty to.

They have been informed of all of the facts. Nonetheless, each has taken the time to write to the Court in the hope that they might be able to provide valuable insight as to the man James Moore is. Attached hereto as Composite Exhibit "D" are the letters of:

| | |
|---|---|
| 1. Gordon Tulley | 2. Michael Barton |
| 3. Stuart Smith | 4. David Giles |
| 5. Malcom Wright | 6. Sandy Brooker |
| 7. Clive Phillips | 8. Colin Alty |
| 9. Richard Williams | 10. Melvin Griffin |
| 11. Patrick Cunningham | 12. Dennis Carr |
| 13. Andrew Callen | 14. Simone B. Phillips |
| 15. Nicholas Dalli | 16. William Ashcroft |
| 17. Cherrie Keene | 18. Richard Pierce |
| 19. Paul Holland | 20. Travor Warth |
| 21. Peter Cookson | 22. Frazer Davy |
| 23. Roger Sabey | 24. David Hooker |
| 25. Hannah Carter | 26. Marc Galbraith |
| 27. David Honeyman | 28. Sharon Smith |
| 29. Samantha Leverette | 30. Mike Ellis |
| 31. Neil Woodward | 32. Jeff Danik |

Mr. Moore hopes that the Court will factor into its decision the thoughts and comments of the people in the community that know him best.

**(2) The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.**

The sentence imposed should be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and protect the public from future crimes of the Defendant.

It is respectfully suggested that a **sentence of credit time served** meets each of these objectives. Because Mr. Moore is not a United States citizen he was incarcerated for approximately 2 months following his arrest. When he was finally released on bond he was forced to wear an ankle bracelet and had a daily curfew. Mr. Moore could not legally work in the United States because he did not have a work visa. In addition, he was unable to visit family and friends because they reside in Spain. Mr. Moore's life was effectively placed on hold the entire time that he was placed on bond. A review of the sentences rendered in recent misprision of a felony criminal cases has yielded several cases within this range. These cases include the following:

i.    *United States v. Hanahan,(M.D. PA. 2014);* sentenced to two years supervised release, including six months home confinement, for failure to report the nature and extent of her paramour' cocaine trafficking.

ii    *United States v. Cody M. Lacefield, (D. NEB. 2016);* sentenced to three years supervised release including 90 days home confinement for failure to advise law enforcement that he gave firearms to marijuana users to hold for him.

iii   *United States v. Bliss Worrell, (E.D. Missouri 2016);* former prosecutor was sentenced to 18 months probation for concealing her knowledge of police officer's placing gun barrel in mouth of suspect while handcuffed and threatened to shoot him.

iv    *United States v. Courtnee Brandtley (M.D. FL 2015);* was sentenced to incarceration for one year and one day for concealing her vehicle which she

had been driving without a tag and had been pulled over by Tampa Police Officers Curtis and Kocab. She had witnessed Dontae Morris shoot and kill the police officers. Brandtley left the scene and hid her car.

v. *United States v. Marshall D. Banks and James Garvin, (D.C. 2013);* defendants pled guilty to the charge of misprision of a felony relating to the misappropriation of $392,000 from government programs. Both defendants received sentences of 3 years of probation.

vi. *United States v. Osvaldo Caraballo-Rodriguez, (2003);* defendant, a police officer, failed to disclose drug crimes he was involved in pled guilty to a misprision of a felony and was sentenced to credit time served.

vii *United States v. Caren Battaglia, (E.D. LA 2016);* the defendant a licensed nurse at Abide Home Care Services pled guilty to misprision of a felony for failure to report a $30 million Medicare Fraud scheme. Defendant was sentenced to credit time served and a $2,000 fine.

The cases set forth above are not intended to be an exhaustive list of all comparable cases. They are provided in support of Defendant Moore's position that a sentence of credit time served would comply with the mandate that "the court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection". *18 U.S.C. Section 3553(a)(1).* The government has indicated that it will request the Court to order a sentence of 15 months. Such a sentence is in accordance with the plea agreement of the parties however, such a sentence would

appear to be more severe than necessary to accomplish the goals of Section 3553(a).

**(3) The Kinds of Sentences Available:**

In this particular case, it is clear that a sentence of incarceration, community confinement, home confinement or credit time served are the kinds of sentences that is both available and appropriate. Because Mr. Moore is a citizen of the United Kingdom and not the United States he will likely be deported. As a result, a sentence of probation or supervised release would not be practical. Further, the Bureau of Prisons avoids placing individuals who have an immigration hold in community confinement.

**(4) The Sentencing Range Established by the Guidelines.**

**(A) Presentence Investigation Report:**

The probation officer assigned to this case has prepared a comprehensive Presentence Investigation Report. However, Mr. Moore does not agree with the report to the extent that it does not recommend a downward variance from the recommended sentencing guideline range.

**Federal Sentencing Guidelines Sentence Range is not Presumed Reasonable:**

The Supreme Court has recently made clear that the district courts are not permitted to presume that within-guideline sentences are reasonable. *See Nelson v. United States, 129 S. Ct. 890, 892, 172 L. Ed. 2d 719 (2009).* In *Nelson*, the district court made the following statement during sentencing: "the Guidelines are considered presumptively reasonable," and so "unless there's a good reason in the [statutory sentencing] factors . . .,

-15-

the Guideline sentence is the reasonable sentence." *Id. At 891.* In evaluating this statement, the Supreme Court emphasized that:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms: We repeat that the presumption before us is an appellate court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Id. at 892 (internal citations and quotation marks omitted).*

The Supreme Court found that even though the district court had viewed the Sentencing Guidelines as advisory, because the court presumed that a within-guideline sentence was reasonable, the resulting sentence was erroneous. *United States v. Alexander, 339 Fed. Appx. 941 (11th Cir 2009).    See also, United States v. Schmitt, 495 F.3d 860 (7th Cir. 2007);* wherein the court stated:

> As we stated in *United States v. DeMaree, 459 F.3d 791, 794-95 (7th Cir. 2006)*: The judge is not required--or indeed permitted, *United States v. Brown, 450 F.3d 76, 81-82 (1st Cir. 2006)*--to "presume" that a sentence within the guidelines range is the correct sentence and if he wants to depart give a reason why it's not correct. All he has to do is consider the guidelines and make sure that the sentence he gives is within the statutory range and consistent with the sentencing factors listed in 18 U.S.C. § 3553(a).

The procedure demands that the court "sentence based on 18 U.S.C. Section

3553(a) without any thumb on the scale favoring a guideline sentence."

*United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).*

Mr. Moore respectfully urges the Court to find based upon all of the 18 U.S.C.

Section 3553(a) factors, including the Federal Sentencing Guidelines, that the appropriate

sentence in this case be credit time served.

**(5) Any Pertinent Policy Statement:**

Counsel for Mr. Moore has not identified any policy statement that is particularly

pertinent to the facts presented in the instant case.

**(6) The Need to Avoid Sentence Disparities Amongst Defendants:**

In the instant case, there are several persons who were initially charged with bank

fraud but had their sentence reduced:

a. **Stephanie Lunde**, the charges against Ms. Lunde were dropped;

b. **Eric Johnson,** was permitted to enter a P.T.I. sentence with the anticipation

that the charges will be dropped at the end of the 12 month P.T.I. period;

c. **Helen Jones**, charges were reduced to misprision of a felony and a

recommendation for a sentence of probation.

Based upon the facts and circumstances of this case it would not be equitable for

these persons to get lighter sentences and Mr. Moore.

**(7) The Need to Provide Restitution to Victims:**

     Mr. Moore's conduct did not cause any damage to any party.

**Conclusion:**

     There is a wide range of sentences that may be ordered by this Court. The question is what sentence is sufficient to be just punishment for the offense and will promote respect for the law, but at the same time is no harsher than is necessary to accomplish these goals and will be viewed as fair. Under all of the circumstances of this case and what Mr. Moore has been through to date, it is respectfully suggested that a sentence of credit time served is the just sentence for Mr. Moore. Mr. Moore has been prohibited from living in his country for over a year and he also has been prohibited from working during this period of time. Unlike the others in this case, he has served a de facto period of incarceration for the past 14 months. More importantly, because the United Kingdom has decided to exit the European community effective March 2019, Mr. Moore and his wife Karina will loose their right to residency in Spain if they both are not physically present in Spain at that time.  However, Mr. Moore must first return to Spain by July 2018, to reinstate his residency. This is due to the fact that if he is absent from Spain for 2 uninterrupted years, his residency will lapse.  Mrs. Moore is unable to obtain permission to live in England because Mr. Moore is a resident of Spain.  If this issue is not properly resolved, the end result may be that Mr. Moore will be forced to return to

England and his wife will not be permitted to live there.  This result would cause cruel and unusual punishment not intended under the sentencing guidelines.

Respectfully submitted,

DAVID M. GARVIN, P.A.
Attorney for Defendant, James Moore
200 South Biscayne Boulevard,
Suite 3150
Miami, Florida 33131
Tel:  (305) 371-8101
Fax: (305) 371-8848
Email: ontrial2@gmail.com

By:   /s/  David M. Garvin

DAVID M. GARVIN, ESQ.
Florida Bar No. 347736

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 4, 2018 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to all counsel of record.

/s/  David M. Garvin
DAVID M. GARVIN, ESQ.